1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GUILLERMO CONTRERAS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF DES MOINES, et al.,<br><br>Defendants. | CASE NO. C11-0326JLR<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I.   INTRODUCTION

This lawsuit arises from an incident on February 25, 2009 in which police officers in Des Moines, Washington responded to a 911 call at Plaintiff Guillermo Contreras's residence and, according to Mr. Contreras, tased and beat him. (*See generally* Am. Compl. (Dkt. # 2)).) Mr. Contreras brings claims against the City of Des Moines ("City") and several unknown officers for assault, unlawful seizure, excessive force, harassment, unlawful arrest, negligent infliction of emotional distress, and negligence. (*Id.* ¶¶ 5.1-5.6,

ORDER- 1

5.8.) Mr. Contreras also brings a claim against the City pursuant to 42 U.S.C. § 1983 for failing to train, supervise, and discipline its police officers. (*Id.* ¶ 5.7.)

Currently before the court is the City's motion for summary judgment on the claims against it for excessive force (third cause of action); failing to train, supervise, and discipline (seventh cause of action); and harassment (fourth cause of action). (*See generally* Mot. (Dkt. # 19).) Mr. Contreras had conceded that summary judgment is proper as to the harassment claim (Resp. (Dkt. # 21) at 7), and accordingly the court GRANTS the City's motion as to this claim. Mr. Contreras, however, contends that he has raised issues of material fact as to the remaining claims that preclude summary judgment. (*See generally* Resp.) Having considered the submissions of the parties, the balance of the record, and the relevant law, the court GRANTS the City's motion for partial summary judgment.[1]

## II.   BACKGROUND

On the evening of February 25, 2009, Mr. Contreras was in his condominium in Des Moines with his long-time partner Salvador Gonzalez-Canseco when police officers knocked on their door. (Bible Decl. (Dkt. # 22) Ex. H ("Contreras Dep.") at 9, 21.) Although Mr. Contreras testified at his deposition that he did not call 911 prior to the police's arrival (*id.* at 21-22), a responding officer's report indicates that the 911 operator received a hang-up call from Mr. Contreras's residence (Jolley Decl. (Dkt. # 20) Ex. A (Officer Shields's Police Report) ("Shields Report") at 2). The police report stated that

---

[1] Neither party has requested oral argument and the court deems this matter to be appropriate for resolution without a hearing.

ORDER- 2

1 the police were dispatched after the 911 operator received an answering machine when
2 the operator tried calling Mr. Contreras's residence back after the hang-up. (Shields
3 Report at 2.) Mr. Contreras confirmed that he heard the telephone ring but explained that
4 he did not answer the telephone because it was after 10 pm, and he does not answer the
5 telephone that late in the evening. (Contreras Dep. at 23-24.)

6 According to Mr. Contreras, he was in his bedroom with the door closed when the
7 police began to knock loudly on his door and yelling, "Police! Police!" (Contreras Dep.
8 at 22.) Mr. Contreras testified that when he answered the door, wearing pants but no shirt
9 or socks, his dogs escaped from the condominium. (*Id.* at 22-23.) He reportedly asked
10 the police officers to wait so that he could get his dogs back inside.[2] (*Id.* at 25-26.) Mr.
11 Contreras testified that the officers did not specifically respond to his request to wait, but
12 they made signs for him to step outside and close the door behind him, which he did. (*Id.*
13 at 26-27.)

14 Mr. Contreras further testified that the officers told him to sit down, and when he
15 started to sit down slowly, an officer shot him with a taser. (*Id.* at 28.) In the next
16 moment, Mr. Contreras testified, about 10 officers "jumped" at him and began to beat
17 him up. (*Id.* at 27-28.) At some point during the alleged beating, Mr. Contreras testified
18 that the officers placed him in handcuffs. (*Id.* at 32-34.) He also testified that the officers
19 detained and handcuffed Mr. Gonzalez-Canseco. (*Id.* at 36.) Eventually, Mr. Contreras
20 testified, the officers removed his handcuffs and had him sign a paper that he did not

21 ───────────────────────

22 [2] Mr. Contreras's primary language is Spanish, but he testified that he said "wait" in English. (Contreras Dep. at 25-26.)

1 understand. (*Id.* at 36.) Mr. Contreras testified that the next day he went to the hospital
2 and was treated for injuries, including a broken rib. (*Id.* at 37.) His hospital bills were
3 approximately $10,000.00. (*Id.*)

4       The police reports from the responding officers corroborate Mr. Contreras's
5 testimony in some respects and contradict it in others. According to Officers Shields and
6 Foster, the first officers on the scene, when they arrived at Mr. Contreras's residence and
7 knocked on the front door, they could hear dogs barking inside the residence. (Shields
8 Report at 2; *see also* Jolley Decl. Ex. B (Officer Foster's Police Report) ("Foster Report")
9 at 1.) The officers reported that they continued knocking and about a minute later they
10 suddenly heard a male voice shout from inside the residence and what sounded like a
11 person slam against the door from within the residence. (Shields Report at 2; Foster
12 Report at 1.) Officer Shields then called for backup. (Shields Report at 2; Foster Report
13 at 1.) Shortly thereafter, a man later identified as Mr. Contreras opened the door, wearing
14 pants but no shirt. (Shields Report at 2; Foster Report at 1.) Officer Shields reported that
15 Mr. Contreras's hair was messed up and his cheeks were red and seemed swollen.
16 (Shields Report at 2.) Officer Shields thought that Mr. Contreras looked as though he
17 had been in a physical fight. (*Id.*)

18       According to the officers, they verbally commanded Mr. Contreras to come out of
19 the condominium and show them his hands. (Shields Report at 2; Foster Report at 1.)
20 Mr. Contreras stepped out of the condominium, but the officers both stated that he failed
21 to follow further commands. (Shields Report at 2; Foster Report at 1.) By this time,
22 three additional officers had arrived on the scene. (Foster Report at 1.) The police

ORDER- 4

reports in the record state that Officer Emly deployed her taser into Mr. Contreras after he failed to obey their commands. (Shields Report at 2; Foster Report at 1; Bible Decl. Ex. D (Officer Emly's Police Report) ("Emly Report") at 1; Bible Decl. Ex. E (Officer West's Police Report) ("West Report") at 1.) Officer West reported that after Mr. Contreras was tased, he still refused to allow the officers to handcuff him and was holding his hands under his stomach. (West Report at 1.) Officer West further reported that he gave Mr. Contreras several verbal commands with no success, and then gave Mr. Contreras two closed-hand strikes to the upper back area, at which time Mr. Contreras complied and was handcuffed. (*Id.*)

After the officers handcuffed Mr. Contreras, the reports indicate that they learned that Mr. Gonzalez-Canseco was in the back bedroom. (Shields Report at 3.) According to Officer Shields, they shouted into the condominium, identifying themselves as police officers and ordering Mr. Gonzalez-Canseco to open the bedroom door, which the officers could see from their position at the entrance of the condominium. (*Id.*) Mr. Gonzalez-Canseco reportedly opened the bedroom door at least twice, shouting at the officers in Spanish, but closed the door each time. (*Id.*) Officer Shields reported that several officers then entered the residence, continuing to shout commands. (*Id.*) When they forced open the bedroom door, Officer Shields reported that Mr. Gonzalez-Canseco took an aggressive stance, at which time Officer West discharged his taser into Mr. Gonzalez-Canseco and then handcuffed him. (*Id.*)

After both men were in handcuffs, the officers reportedly spoke with Mr. Contreras, who indicated that Mr. Gonzalez-Canseco had punched him twice in the face

ORDER- 5

after they had argued over family issues. (Foster Report at 2; Emly Report at 2.) The officers reported that Mr. Contreras told them that he had tried to answer the door when the officers first knocked but that Mr. Gonzalez-Canseco had shoved him into the door and prevented him from answering. (Shields Report at 4; Foster Report at 2.) Officer Shields reported that Mr. Contreras indicated on the domestic violence supplemental report—the report that Mr. Contreras later testified he did not understand—where Mr. Gonzalez-Canseco had punched him and initialed the report in the appropriate areas. (Shields Report at 4.) The officers then transported Mr. Gonzalez-Canseco to the police department for processing. (Shields Report at 4; Foster Report at 2; Emly Report at 2.)

On February 24, 2011, Mr. Contreras filed the instant lawsuit against the City and unknown officers. (Compl. (Dkt. # 1).) In his amended complaint, he alleged claims against the City of Des Moines ("City") and the officers for assault, unlawful seizure, excessive force, harassment, unlawful arrest, negligent infliction of emotional distress, and negligence. (Am. Compl. ¶¶ 5.1-5.6, 5.8.) He also brought a claim against the City pursuant to 42 U.S.C. § 1983 for failing to train, supervise, and discipline its police officers. (*Id.* ¶ 5.7.)

On January 27, 2012, the City filed the motion for partial summary judgment that is currently before the court. (*See generally* Mot.) The matter has been fully briefed by the parties and now is ripe for adjudication.

### III. ANALYSIS

The City admits that there are disputed issues of fact related to the February 25, 2009 incident, but it maintains that resolution of these issues is unnecessary for the court

ORDER- 6

to rule in its favor on the instant motion. (Mot. at 1.) Even if the court assumes, for the purposes of this motion, that the responding officers violated Mr. Contreras's constitutional rights, the City contends that there is no evidence in the record that would hold the City responsible for any excessive use of force or for a failure to train, supervise, or discipline. (*Id.* at 5-8.) Mr. Contreras responds that the police reports, domestic violence report, and the actions of the police officers during the incident are sufficient for a reasonable juror to conclude that the City violated 42 U.S.C. § 1983. (Resp. at 6.) For the reasons describe below, the court agrees with the City that Mr. Contreras has failed to put forth evidence creating a genuine issue of material fact as to the City's liability for excessive force or for a failure to train, supervise, or discipline. Accordingly, the court grants the City's motion for partial summary judgment.

**1. Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477

F.3d at 658.  The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### 2. Mr. Contreras's Excessive Force Claim Against the City

The City first moves for summary judgment on Mr. Contreras's excessive force claim against it.  In the seminal Supreme Court case *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Court held local government units were "persons" for purposes of § 1983, but that they could only be held liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690.  The Court further held that municipalities could be "sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*  The Court made clear, however, that municipalities "cannot be held liable under § 1983 on a *respondeat superior* theory" and may only be held liable where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.  "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (Brennan, J., concurring) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)) (emphasis in *Pembaur*).

1   Since *Monell*, "the Supreme Court has held that 'an unconstitutional government
2   policy could be inferred from a single decision taken by the highest officials responsible
3   for setting policy in that area of the government's business.'" *Delia v. City of Rialto*, 621
4   F.3d 1069, 1081 (9th Cir. 2010) (quoting *Praprotnik*, 485 U.S. at 123). "Under this
5   paradigm, however, '[m]unicipal liability attaches only where the decisionmaker
6   possesses final authority to establish municipal policy with respect to the action
7   ordered.'" *Id.* (quoting *Praprotnik*, 485 U.S. at 481) (alteration in *Delia*). Thus the Ninth
8   Circuit recently summarized the law as follows:

> [I]n order to establish an official policy or custom sufficient for *Monell* liability, a plaintiff must show a constitutional right violation resulting from (1) an employee acting pursuant to an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a "final policy maker."

12  *Id.* at 1081-82 (quoting *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)).
13    Mr. Contreras does not argue that the officers were acting pursuant to an
14  expressly adopted official policy, and although he mentions that supervisors
15  signed off on the officers' reports, he does not argue nor is there any evidence that
16  these supervisors were acting as final policy makers. (Resp. at 5-6.) Rather, Mr.
17  Contreras argues that the use of force was authorized and condoned by the
18  municipality because the officers were working in their official capacities as
19  police officers and the tasers were issued by the police department. (*Id.*) More
20  specifically, Mr. Contreras maintains that because the officers tased both Mr.
21  Contreras and Mr. Gonzalez-Canseco and then determined that Mr. Contreras in
22  fact was a victim, "[a] reasonable jury could conclude that the Des Moines Police

department has a custom or practice of tasing first and asking questions later."
(Resp. at 6.)

Viewing the evidence in the light most favorable to Mr. Contreras, the court concludes that he has not presented sufficient evidence to create a genuine issue of material fact regarding whether the police department has a custom or practice that caused a constitutional deprivation. Assuming for the purposes of ruling on the instant motion that the officers violated Mr. Contreras's constitutional rights, Mr. Contreras's only evidence of a custom or practice is that the officers tased both him and Mr. Gonzalez-Canseco on the night of February 25, 2009. This, however, is insufficient to establish a "longstanding practice or custom" as is required to hold the City liable under § 1983. *Delia*, 621 F.3d at 1081-82; *see also Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992) (finding that the plaintiff did not present evidence of preexisting custom or practice that would permit imposition of municipal liability in part because he "did not present any evidence as to how long this alleged informal policy existed, which is a crucial element of the inquiry . . ."). Accordingly, the court grants the City summary judgment on Mr. Contreras's claim for excessive force.

**3. Mr. Contreras's Failure to Train, Supervise, and Discipline**

The City also moves for summary judgment on Mr. Contreras's claim that it is liable under § 1983 for failing to train, supervise, and discipline its officers. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official

ORDER- 10

government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Where a plaintiff alleges that a municipality's omission caused a constitutional violation to be committed by one of its employees, "the plaintiff must show that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002). "Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Connick*, 131 S. Ct. at 1359-60 (internal citation and quotation omitted). The Supreme Court has explained that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 1360 (quoting *Bd. of Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 410 (1997)); *see also Gibson*, 290 F.3d at 1186.

In sum, to impose liability against the City for failing to train or supervise[3] its officers, Mr. Contreras must show: (1) that an officer violated his constitutional rights; (2) the City had customs or policies that amounted to deliberate indifference; and (3) that these customs or policies were the "moving force" behind an officer's violation of his constitutional rights, in the sense that the City could have prevented the violation with an appropriate policy. *Gibson*, 290 F.3d at 1193-94. Mr. Contreras argues that there is no

---

[3] Although Mr. Contreras's claim also includes failure to discipline, the Ninth Circuit has explained that "[a] failure to discipline is not a separate ground for establishing municipal liability. Rather, it is evidence that tends to establish the absence of or failure to enforce a policy . . . ." *Conn v. City of Reno*, 572 F.3d 1047, 1065 (9th Cir. 2009), *vacated by* 131 S. Ct. 1812 (2011) *and reinstated in relevant part by* 658 F.3d 897 (9th Cir. 2011).

evidence that the officers wrote "use of force reports" and that the failure to investigate or review the force used against Mr. Contreras, a victim, demonstrates a "remarkable indifference" to his constitutional rights. (Resp. at 6.) Even assuming, for the purposes of ruling on this motion, that the officers violated Mr. Contreras's constitutional rights, he has presented no evidence of a custom or policy that amounted to deliberate indifference as that term has been defined by the Supreme Court. *See Connick*, 131 S. Ct. at 1360. Moreover, even if the City had a policy of allowing officers to fail to complete "use of force reports," there is no evidence in the record that such a failure was the moving force behind the alleged constitutional violation or that the City could have prevented the alleged violation through an appropriate policy. The court thus grants the City summary judgment on Mr. Contreras's claim for failing to train, supervise, and discipline its officers.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS the City of Des Moines's motion for partial summary judgment (Dkt. # 19).

Dated this 27th day of February, 2012.

*[signature]*

JAMES L. ROBART
United States District Judge